Filed 10/17/25  In re C.A. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.A., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.A.,<br><br>Defendant and Appellant. | F088955<br><br>(Super. Ct. No. JD145434-00)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Kendra L. Graham, Interim County Counsel, and Judith M. Denny, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

C.A., then five years old, was taken into protective custody in January 2024 by the Kern County Department of Human Services (Department) following receipt of a referral for possible physical abuse by the boyfriend of her mother, M.A. (Mother). The juvenile court subsequently sustained one count under Welfare and Institutions Code, section 300, subdivision (b)(1)(A);[1] declared C.A. a dependent of the court; removed her from Mother's physical custody; awarded Mother and Father joint legal custody and Father S.A. (Father) sole physical custody; ordered two-hour visits between Mother and C.A. twice a week to be supervised by Father as he deemed necessary; and terminated dependency jurisdiction.

Mother timely appealed from the jurisdictional and dispositional orders, and she advances two claims. First, she argues the juvenile court's jurisdictional finding against her is not supported by substantial evidence that she had failed to protect C.A. or that, at the time of the jurisdictional hearing, there was a substantial risk of serious future harm based on Mother's failure or inability to adequately supervise or protect her. (§ 300, subd. (b)(1)(A).) Second, she argues the juvenile court erred in finding, by clear and convincing evidence, that there would be a substantial danger to C.A. if returned to her physical custody.

The Department disputes Mother's claims of error.

We recognize the concerns of the Department and the juvenile court. However, this dependency proceeding arose out of an isolated incident with no prior history of abuse or neglect, and no evidence that Mother could have or should have predicted the incident. Further, the Department bears the burden in the lower court of proving a substantial risk of future serious physical harm to C.A. based on Mother's failure or

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

inability to protect her and the juvenile court's jurisdictional finding in that regard must be supported by substantial evidence. (§ 300, subd. (b)(1)(A).) Under the circumstances in this case, we conclude the evidence fell short of satisfying the standard for assuming jurisdiction under the statute, which compels reversal of the court's jurisdictional finding. As this was the only jurisdictional ground alleged and sustained, the juvenile court's dispositional orders are also vacated, and this matter is remanded for dismissal of the petition. As noted below, Mother and Father, who are divorced, shared joint custody prior to this dependency proceeding and given the passage of almost two years since C.A. was removed from Mother's home and placed with Father in Texas, nothing precludes either parent from revisiting those custody orders in family court should they elect to do so.

## PROCEDURAL HISTORY

### I.  Referral, Investigation, and Placement in Protective Custody

C.A. is the only child of Mother and Father, who are divorced. At the outset of this dependency proceeding in January 2024, neither had any other children but Father's wife was then 35 weeks pregnant. C.A. was living in a single family home with Mother and Mother's boyfriend, T.S. (Boyfriend).

On January 12, 2024,[2] as mandated by law, a staff member at C.A.'s school contacted the Ridgecrest Police Department concerning possible child abuse based on bruising C.A. had on her arms, chest, neck, and face. (Pen. Code, §§ 11165.7, subd. (a), 11165.9.) Officer Bebee went to the school, viewed C.A.'s injuries, and spoke to her briefly. C.A. reported the injuries occurred when Boyfriend was taking her out of her car seat and the car seat straps got caught around her neck.[3] Bebee concluded the bruises

---

[2] Subsequent references to dates are to dates in 2024 unless otherwise stated.

[3] Throughout this proceeding, the terms seatbelt and straps were used interchangeably, but the evidence at the jurisdictional hearing showed that C.A.'s harness-style car seat was held in place by the vehicle's seatbelt and it was the chest

were suspicious and wrote in his report that it appeared a large hand had grabbed C.A.'s throat because there were fingertip grip marks on the left side of her neck.[4] The only other incident previously noticed by the school was a scratch on C.A.'s arm, which Mother told them occurred when C.A. was pulling away and Mother attempted to grab her. The school did not suspect any abuse based on that scratch.

Officer Bebee contacted the Department and was advised the school needed to make a report with child protective services (CPS), which it did. The same day, the referral was assigned to emergency response social worker Teel (SW Teel) for investigation, and she met with Mother, Officer Bebee and Sergeant Lloyd at the police station, where Mother agreed C.A. could undergo a forensic interview. SW Teel summarized in the detention report that Mother said Boyfriend pulled C.A. from her car seat the previous day and the straps were not unlatched completely, causing the marks; and Mother was at work at the time and did not use corporal punishment with C.A., but Boyfriend had taken over as the disciplinarian. The report also stated that C.A. said Boyfriend was mad because she got in trouble at school; and that C.A. first said he " 'yanked' " and then said he "pulled her out of the car seat," and the straps caused the marks.

Mother denied to SW Teel any drug or alcohol use, mental health issues, or adult history with CPS. She said she was abused by her father and had experienced domestic violence, so she was very careful about Boyfriend. During C.A.'s forensic interview, which took place at the police station, she reiterated she got stuck in the car seat straps when Boyfriend pulled her out. C.A. said she then went to her bedroom because she got

harness straps to the car seat she was reportedly entangled in. For accuracy and clarity, we will use the terms car seat straps or straps rather than seatbelt.

[4] As discussed below, Officer Bebee testified at the jurisdictional hearing that he did not see anything that resembled a fingerprint, and a physician assistant at the hospital, who examined C.A. that night and was trained to look for such signs of child abuse, did not see any distinctive finger marks.

in trouble at school. Mid-way through the interview when asked what happened next, C.A. reportedly put both hands around her neck in a choking manner but did not describe in words what happened, and when she was asked who did that, she responded with Boyfriend's name. After the interview was over, Sergeant Lloyd told Mother the marks on C.A. were consistent with strangling or choking, not a seatbelt; Boyfriend was going to be arrested; and an emergency protective order (EPO) would be issued. Mother responded that she did not believe Boyfriend was like that, but she said she would do what was asked to protect C.A. and she agreed to meet SW Teel at her house. At the house, they went over protecting C.A. and the EPO. Mother stated she understood and would do what was needed. Mother asked what Boyfriend needed to do to return home, and Teel told her the court might order classes, but Mother needed to focus on C.A. Mother said she would.

On January 16, SW Teel and a case manager with Differential Response (DR) services[5] met with Mother at her house. Teel explained DR to Mother, said the case manager would assist Mother with counseling and the protective order, and told Mother she would contact Boyfriend to let him know it was recommended that he stay away from C.A. and determine possible classes he could take. The case manager subsequently reported that after Teel left, Mother indicated she was not going to sign up for services, did not believe Boyfriend put his hands on C.A., believed the forensic interviewer put the idea of choking in C.A.'s head, and, based on advice from an attorney she spoke with, planned to let Boyfriend back in the house when the EPO expired in three days. She described Mother as polite but dismissive of the Department and police.

---

[5] Differential response services are voluntary services provided in situations that do not call for the filing of a dependency petition. (See § 10609.9, subd. (a)(1)(D); see also <https://www.cdss.ca.gov/inforesources/child-welfare-protection/differential-response> [as of October 16, 2025].)

Boyfriend was interviewed by SW Teel on January 17. He reported he had no criminal or drug use history, and he drank socially only on occasion. Boyfriend denied choking C.A. and said she got tangled up in the car seat straps. He stated his attorney told him he could return home that Friday once the EPO expired. The social worker explained that protecting C.A. was the main concern of the juvenile dependency proceeding, and the Department was advising Mother to obtain a protective order, and that Boyfriend remain out of the home and enroll in anger management classes. Boyfriend stated he understood and asked for how long. During the course of the conversation, he twice stated things were being blown out of proportion.

The social worker then spoke to Mother about the DR case manager's report. Mother stated she understood how the social worker felt but it was her choice what to do and she did not agree with the Department's report of what happened. The social worker told Mother she needed to protect C.A. and that she was being asked to do that. Mother said she understood but asked how long Boyfriend had to be out of the house. She provided the social worker with contact information for Father, who was in the military and stationed in Texas.

Mother contacted the social worker later that day by text and said that Boyfriend's attorney relayed that he would have Boyfriend keep his distance from C.A. and stay out of the house until the case was resolved because Boyfriend did not want to jeopardize Mother's custody of C.A. SW Teel asked by text if Mother meant the criminal case or the CPS investigation, and Mother said the criminal case. Omitted from the detention report but part of the record, SW Teel then told Mother, "OK I will take [sic] to my supervisor. We may need to complete a safety plan with you. I will follow up with you by Friday." Mother said, "Ok."

The next day, Officer Bebee called SW Teel to inform her he was going to contact the district attorney's office about an ongoing protective order. He was concerned Mother was not going to protect C.A. after Mother commented that Boyfriend had

grabbed C.A.'s face before to make her look at them, and she thought that was what had occurred.

On January 19, the Department filed a dependency petition pursuant to section 300, subdivision (b)(1), alleging that C.A. suffered, or was at risk of suffering, serious physical harm or illness as a result of Mother's failure to adequately supervise or protect her from ongoing physical abuse. The petition alleged C.A. had marks on her neck and chin, Boyfriend choked her, and Mother disclosed prior physical abuse, which was based on Mother's statement to Officer Bebee that Boyfriend sometimes grabbed C.A.'s face to make her look at them.[6]

The juvenile court issued a warrant, and C.A. was taken into protective custody and placed in emergency foster care.

## II. Detention Hearing

At the initial detention hearing on January 23, Mother appeared in person and Father appeared by video call. Both parents testified they did not have any Native American ancestry, and the juvenile court elevated Father to presumed father status. The court found a prima facie showing had been made that C.A. came within section 300, ordered her detained from Mother, ordered visitation for both parents, and continued the hearing at the request of C.A.'s counsel.

On January 29, during the continued detention hearing, Father requested placement of C.A. The court reiterated its finding that a prima facie showing had been made that C.A. came within section 300 and she was detained from Mother. The court

---

[6] As discussed below, Mother and Boyfriend's periodic practice of turning C.A.'s head by her chin so that she was looking at them does not constitute physical abuse under the law, and there is no evidence of any prior acts of physical abuse committed against C.A. (*In re D.M.* (2015) 242 Cal.App.4th 634, 640-641 (*D.M.*).) We note the Department did not argue, and the juvenile court did not find, that there was prior physical abuse in this case, and the Department does not advance that argument on appeal.

released C.A. to Father and ordered visitation for Mother a minimum of twice a week, two hours per visit.

## III. Jurisdiction Hearing

Over a three-day period beginning on July 23, the juvenile court held a contested jurisdiction hearing at which Mother called eight witnesses. In issuing its ruling, the court considered the testimony, the exhibits, and the Department's four reports as follows: the jurisdictional report from February 22; the supplemental reports from March 22 and July 18; and the dispositional report from July 18.

### A. Summary of Testimony and Statements

#### 1. Initial Investigation

On January 12, Officer Bebee, and subsequently Sergeant Lloyd, responded to C.A.'s school following a report of possible child abuse. C.A. had bruising to her neck and face, and a scratch on her arm.[7] She reported getting caught in the seatbelt when Mother's boyfriend, who was upset, got her out of the car. Bebee was informed school staff hesitated to tell C.A.'s parents when she got in trouble due to their concern she was being punished too harshly at home.[8] Beebe did not believe the bruising was caused by a seatbelt. He contacted CPS and spoke with a social worker, and he told the school to call CPS. Beebe subsequently transported C.A. to the police station.

After being contacted, Mother and Boyfriend went to the police station. At the police station that afternoon, C.A., Mother, and Boyfriend were interviewed.

---

[7] The distinction between bruises and abrasions was discussed during the hearing and the terms were used interchangeably. There are color photographs of C.A.'s injuries in the record, however.

[8] In his police report, Officer Bebee documented that the school's concern was C.A. being subjected to double punishment for getting in trouble at school, both at school and at home, and her punishment at home was too harsh. However, there is no further information in the record regarding what specific punishment concerned the school or why the school viewed it as too harsh.

### a.      C.A.'s Forensic Interview

C.A.'s forensic interview was conducted by Jacqueline Maxwell, an investigator with the Department.  C.A. told Maxwell that when Boyfriend pulled her out of her car seat, her arm and neck got stuck, and repeated she got stuck in the car seat a number of times.  The recording system was new and as a result of a malfunction, it was subsequently discovered that only Maxwell's side of the interview was visible on camera.  However, Maxwell testified that in response to a question, C.A. put her hands around her neck in a choking motion to demonstrate what Boyfriend did to her, and she made that gesture more than one time.  Thereafter, Maxwell used the same gesture in questioning C.A. but testified she did not do so prior to C.A. demonstrating that Boyfriend put his hands on her neck.

After C.A. demonstrated hands around her neck, Boyfriend, who was being questioned, was arrested and Officer Bebee obtained an EPO order that covered both C.A. and Mother.

### b.      Mother's Statement

Officer Bebee interviewed Mother.  She was not there when the injury occurred but said it happened when Boyfriend was getting C.A. out of his truck.  C.A. was trying to get out, she got stuck, and the clip for the chest harness of the car seat scratched her face.  Mother stated C.A. had very sensitive skin and "little tiny marks make big impacts on her skin."  In response to Bebee's questions, Mother said Boyfriend had no history of any abuse toward her or C.A., he did not have any children, and C.A. was an only child.

### c.      Boyfriend's Statement and Arrest

Officer Bebee also interviewed Boyfriend.  He stated Boyfriend was not under arrest and was free to leave at any time, but he had some questions.  He then said C.A. had some pretty significant injuries around her neck.  Boyfriend said when he talked to Mother the day before, he "just had a bad feeling."  He picked C.A. up from school in the afternoon, and she was in trouble for lying.  She was upset and knew she was going to go

to her room. He undid the buckle of the car seat and loosened the tension of the straps a bit. He said C.A. tended to rush and when she was climbing out, the straps wrapped around her. He thought she was trying to avoid her book bag on the floor in front of her seat. He caught her after she tripped and fell shoulder first, and then they went into the house. They talked about lying, she was crying, and he sent her to her room.

Boyfriend noticed a red mark and he texted Mother to let her know C.A. got caught getting out of the truck.

Officer Bebee asked about discipline and Boyfriend said C.A. usually got yelled at and sent to her room to stand there.

Boyfriend said he had long fingernails, which grew fast; Mother had told him to cut them before, as had his father growing up; and he had scratched C.A. and Mother with them more times than he could count. He did not know when the current scratch on C.A.'s arm occurred, but he thought he grabbed her arm. He also said they all roughhoused together, flipping C.A. up and throwing her on the bed. He stated he would never hurt her.

At that point, Officer Bebee told Boyfriend he could go sit outside the room with Mother.

Boyfriend was then brought back for more questioning. He was again told he was free to leave. He reiterated he had had a bad feeling, and he had scratched or bruised C.A. before just playing. He described the car seat for Officer Bebee and said he had backed up because C.A. liked to get out of the car by herself. He was not sure if he was on his phone or something else, but he was not really looking, and she got tangled up getting out of the car. She was slipping, and he grabbed her arm and got her out. He stated "it was a freak thing," he "would not hurt her," and they did not hit or spank as discipline. He said he had accidentally scratched and bruised her before, but he did not recall yanking her out and again stated they do not hit.

10.

Boyfriend told Officer Bebee he was "freaking out" and asked for water. Bebee left Boyfriend alone for approximately 21 minutes. Boyfriend said he did not understand why he was there and asked if he and Mother could leave since he was told he was free to leave. Bebee said his supervisor wanted to speak with Boyfriend, and a detective came in. Boyfriend again said C.A. bruises easily and had sometimes been bruised or scratched while they were playing, and he mentioned his long nails. He said he understood they were doing their job, but he loved C.A. and would never hurt her. He again said he was freaking out and he had never been in trouble for anything. He reiterated C.A. got tangled up, but he did not know exactly how it happened.

The detective then told Boyfriend he was being detained, handcuffed Boyfriend with two pairs of cuffs, and read him his rights. Boyfriend repeated C.A. was in trouble for lying. Mother told her the morning before that she was in trouble for lying and when he picked her up, he told her she was still in trouble for what she did the day before. He said she was probably upset and knew she was going to her room, which she did not like. Boyfriend said, "[A]t no point … did I wrap something around her neck or try to yank her out of the car." He reiterated he opened the door, looked away, and when he looked back, she was in an awkward position with the strap around her neck.

Boyfriend, then uncuffed, was asked to demonstrate what happened on a prop. He explained, consistent with his previous statements, that he opened the door, undid the buckle, loosened the shoulder straps a little bit, stepped back, and looked away for a few seconds. When he turned back, the plastic clip was on the side of her head. He also reiterated she made awkward movements when she was nervous, and she hated going in her room when she was in trouble. He stated sometimes her punishment was staring at the wall and she hated that.

Questioning resumed after a break and Boyfriend stated, "I'm telling you one thing I swear on my fucking, I did not put my hands around that girl. I did not. I would never, did not. Would not." Sergeant Lloyd subsequently suggested Boyfriend got

11.

frustrated and pulled C.A. from the seat. Boyfriend said he helped her out of the car but "did not do anything with malice" and "did not intentionally yank on her." He also reiterated they did not spank or hit for discipline, the strap was around her neck, and he did not yank her out of anger. He said he was frustrated and angry she lied and was mean to other kids at school, but she had done those things many times before and he did not "process that frustration toward her[.]" He denied doing anything to make things worse by pulling or digging the clasp in, and again said he opened the door, backed up because she liked to get out on her own, and she slipped with that plastic clip around her throat. He stated he undid the buckle and the clip but did not loosen the tension all the way. He indicated he thought she was falling out of the car and just acted, reaching for her arm. He denied reaching for her arm and pulling her to hurt her, and said it was an accident.

Boyfriend was left alone for a while and then Officer Bebee returned. He again asked Boyfriend to state what happened, and Boyfriend repeated he did not undo her strap all the way, she got caught in it around her throat and chin, and he then got her out of the car. He denied choking her or putting his hands around her throat. C.A. went to her room, and he made her put her nose to the wall for a little bit. He stated he did yell at her about being a bully, and when Mother got home, he told her what happened.

Officer Bebee told Boyfriend C.A. imitated him grabbing her around the neck and Boyfriend vehemently denied wrapping his hands around her neck or choking her at any point. Bebee then placed Boyfriend under arrest for child abuse.

### 2. Medical Testimony

#### a. Physician Assistant

That evening after Boyfriend's arrest, Office Bebee arranged for Mother to bring C.A. to the hospital for evaluation. The physician assistant (PA) who saw C.A. testified that she had bruising on both sides of her jaw and her neck but no distinctive finger marks. The PA's report reflected Mother reported "that a man grabbed [C.A.'s] chin and did not choke her," and C.A. was pulled out of her car seat while strapped in, causing

12.

bruising. The PA testified that bruising of the neck and chin in children is not often seen and is alarming, particularly neck bruising. As a mandated reporter, she would have reported the bruising based on its location but did not since CPS was already involved. She testified it was possible to get bruises like C.A. had from being suspended by seatbelt or car seat straps, and the jaw bruising "fit" with a man grabbing her chin to turn her head. Choking was also a possibility that could not be fully ruled out.

C.A. was initially shy but within 15 minutes, she was playful and laughing, and she did not show any signs of distress. C.A. did not have any pain, she was able to drink water, she moved her neck appropriately when palpated, and there was no medical indication for a neck or head CT. Based on Mother's representation that C.A. had sensitive skin, the PA ordered lab work to rule out a possible bleeding disorder and anemia, but the results were unremarkable. C.A. was discharged in stable condition and the report noted, "Serious or life threatening conditions are unlikely to be a cause for the patient's findings."

### b. Nurse

The nurse who attended C.A. at the hospital testified she presented with a bruise to her jawline and bruising on the outside of her arm. Mother stated she was there for an evaluation based on someone grabbing C.A.'s chin and moving her head, and C.A. getting caught in her seatbelt. The nurse asked C.A. if anyone grabbed her, and C.A. indicated someone turned her chin to speak to her directly when she turned her head away and she demonstrated the movement of her chin with her finger and thumb. The nurse also asked C.A. if anyone hurt her, and C.A. said no. Neither Mother nor C.A. reported any choking, but Mother told the nurse the police wanted C.A. evaluated because they were concerned she was choked.

C.A. did not show any signs of discomfort when her jawline was palpated and did not otherwise show any signs of discomfort. The nurse did not see any clinical indications of abuse so did not make a report. She stated C.A. was appropriately shy with

13.

strangers, playful, made eye contact, and showed no fear; she had no markers they look for in child abuse cases and she did not interact inappropriately with Mother; and there was a plausible explanation for the bruised chin and jawline. C.A.'s injuries did not seem to the nurse to be inconsistent with the injuries Mother related and childhood play. The nurse explained that children often run into things, bruising their arms, and C.A. did not have any bruises in places children would be expected to guard, such as the ribs or abdomen. The nurse did not think the bruises were attributable to C.A.'s chin being grabbed as she demonstrated because it was a lateral bruise rather than at the tip or on the bottom of the chin, and the nurse described it as superficial bruising.

The nurse recalled an officer wanted C.A. to have an MRI scan, but the emergency room only had one MRI machine, which staff reserved for suspected stroke patients, and a CT scan would not be done unless clinically indicated, which was not the case.

Mother testified that at the hospital, Officer Bebee was insistent about getting an MRI scan, and before they left, he told her that he was still going to ask her to get an MRI scan for C.A., "even if he had to drive [them] out of town." Bebee testified he could not recall specifics, but he believed he called Mother to offer other services to get C.A. checked since the hospital would not do a CT scan, and they were willing to transport her to those services. He testified he was very worried about C.A.'s health and tried to offer as many services as he could to confirm her health.

### c.    C.A.'s Primary Care Provider

On January 17, after Mother spoke with SW Teel, she took C.A. to her primary care provider (PCP), also a physician assistant.[9] The PCP's report stated that C.A. had a healing pressure/abrasion lesion on the right side of her chin and several smaller abrasions, which police and CPS attributed to a strangulation attempt by Mother's

---

[9] The parties accepted Mother's counsel's offer of proof that C.A. was seen by her PCP several times prior to January 17 after he testified he saw her only that one time.

boyfriend; and the lesion was consistent with a seatbelt. Mother reported Boyfriend did not remove the car seat harness properly at the time, it was sometimes too tight, and occasionally the straps or the plastic clip would scratch C.A.'s chin. The report also stated that the PCP viewed the photos Mother took of C.A.'s injuries on January 12.[10] In the report, the PCP stated there was no indication of strangling and he did not believe she was subjected to an attempted strangulation.

At the hearing, the PCP, who since seeing C.A. was preparing to retire, testified the marks looked like they were from rubbing rather than grabbing, and he saw a well-healed abrasion rather than bruising. He did not have any lab results or other records from C.A.'s visit to the hospital, so his opinions were based on information from Mother and his examination of C.A. Questioned concerning why he noted he agreed with his emergency department counterparts given the absence of records or any conversation with the PA at the hospital, he said he based his statement on what reasonably prudent emergency department medical staff would do if nonaccidental trauma was suspected. He also testified he would be surprised if the hospital's PA was concerned about C.A.'s bruises, and the photos he saw looked more like rubbing than a large hand grabbing and abrading the face. At the conclusion of his testimony, the photographs taken by Mother were displayed and the PCP denied ever seeing them.

### 3. Events After Boyfriend's Arrest

The morning after Boyfriend's arrest and C.A.'s evaluation at the hospital, police came to Mother's house. Sergeant Lloyd testified Boyfriend had bailed out of jail and they believed Mother possibly picked him up and, because she did not believe he hurt C.A., was going to allow him back in the house. Sergeant Lloyd did not recall what it was, but something made them suspect Boyfriend was at the house, and Lloyd asked

---

**10** The PCP's report stated the photos were taken January 11 but the parties agreed this was an error on the PCP's part and the photos were taken by Mother on January 12.

Officer Bebee to surveil Mother's house. Bebee testified they were ensuring Boyfriend did not violate the EPO.

Mother testified police came to her house and asked to see the mark on C.A.'s face, to take photos of her room, and to see her doorbell camera footage. She allowed Sergeant Lloyd to view the camera footage on her phone, and she permitted only Officer Bebee to come inside to see C.A. and take photos. The others entered as well, however, and Mother told Sergeant Lloyd multiple times she had not allowed them in and to leave. He repeatedly asked her if she wanted him to get a warrant, and he accused her of lying and hiding Boyfriend in the house. In return, she said he was lying to her. She estimated they went back and forth with her ordering him to leave and him asking if she wanted him to get a warrant approximately four to six times.

Sergeant Lloyd recalled Mother only wanted one police officer to come inside and he did not think she allowed them to search. He recalled one officer agreeing with her request, but he wanted at least two officers inside given their suspicion Boyfriend was there and they partially entered. He recalled telling her he thought she was lying and she was hiding Boyfriend in the house, and telling her they would get a warrant if she allowed him back inside. He testified Mother "eventually" said she would comply with the EPO and not have contact with Boyfriend.

The EPO was to expire on Friday, January 19. On January 17, SW Teel spoke with both Mother and Boyfriend, as summarized above. In her report, Teel documented that Boyfriend would remain out of the home until the criminal case was over. At the jurisdictional hearing, Mother introduced the text message exchange, in which Teel responded that she would talk to her supervisor, they might need to complete a safety plan, and she would follow up with Mother by Friday. Mother said okay and testified that Teel never followed up with her.

On January 18, as set forth above, Officer Bebee told SW Teel that Mother disclosed Boyfriend had grabbed C.A.'s face before and she thought maybe that was

16.

what happened.  Bebee expressed concern Mother was not going to protect C.A. and stated he was going to seek a protective custody warrant.  Mother testified that she told Bebee on January 12 about grabbing C.A.'s face to make her look at them when she was being scolded, by which she meant moving C.A.'s face to look at them.  She denied telling Bebee Boyfriend did so aggressively, and testified they both did it, she had seen Boyfriend do it fewer than five times, and neither of them ever left a mark when they did it.  She said she mentioned it to Bebee but was speculating about what might have happened.

C.A. was removed the next day.

### 4.      Summary of Mother's Other Testimony

Mother met Boyfriend in 2009 when he moved to Ohio, where she lived, for college, and she had never known him to be violent with anyone.  They reconnected in 2022, and Boyfriend moved to California in July 2023.  She testified C.A. and Boyfriend took to each other right away, there were no parenting disagreements, and they did not use physical punishment.  She denied Boyfriend was the disciplinarian and said they both disciplined C.A.

In January, C.A. was getting into trouble at school multiple times a day for lying, not listening to her teachers, and not being nice to her friends or bullying.  At school, her punishment was sitting on the "thinking stool," and Mother would talk to C.A. sternly in front of her teachers and make her apologize for her behavior.  At home, she was punished by being sent to her room, and if she was not listening or paying attention when she was in trouble, they would grab her chin and move it toward them, so she was looking at them.  Mother never saw Boyfriend grab C.A. too hard and there were never any marks.  Sometimes, if there were too many distractions around, they had her face the wall, but Mother denied they made her touch her nose to the wall.  They also took away rewards or talked to her, depending on the severity of her behavior; and both would get

17.

upset at C.A. and yell at her at times. The school never expressed concern to Mother about any nonaccidental injuries or discipline at home that was too harsh.

She was at work when C.A. was injured, and Boyfriend told her right away that C.A. got caught in the seatbelt. When she got home, she dressed C.A. for gymnastics and because she was standing up, she did not see the bottom of C.A.'s jaw. When Mother noticed marks, she asked C.A. what they were. C.A. said she got stuck in the seatbelt, she consistently said so, and she never said to Mother that Boyfriend choked her. Mother photographed C.A.'s injuries that night with her phone and never saw anything resembling a finger mark, and C.A. never expressed any pain from the injury. She went to gymnastics that night, did not exhibit signs of impaired movement, and demonstrated no fear of Boyfriend. Mother had never seen marks like that before on C.A. and was concerned.

Mother testified she previously had seen C.A. struggle getting out of her car seat, and she had told Boyfriend to pay closer attention. C.A. had also gotten tangled in the straps before because she liked to do the chest clip herself and sometimes it did not disengage, but there were never any marks because she was not entangled around her face. Mother also testified she reported C.A. had sensitive skin, by which she meant a scratch could become a red mark on C.A. She testified Boyfriend and C.A. roughhoused and sometimes Mother told him he had gone too far. She explained it was usually more that C.A. was climbing on him like a jungle gym, and she would put a stop to it. Sometimes Boyfriend would flip C.A. over and she just wanted to ensure things did not get too rough, like swinging C.A. too much, too hard, or too high. Occasionally, C.A. would have minor bruises and scratches from roughhousing with Boyfriend.

When they went to the police station the next day, they were not told what it was concerning so they thought it was about a pedophile they reported who kept coming to their house. When she found out it was concerning C.A., she was cooperative and agreed to be interviewed. Although she did not request an EPO, she said she would cooperate

18.

once Sergeant Lloyd and SW Teel informed her about it. She testified Boyfriend did not attempt to contact her, she complied with the EPO, and she did not protest it. She spoke with Boyfriend's parents after he was arrested, and they arranged for his release from jail. Her longtime family friend, D., picked Boyfriend up from jail and Boyfriend stayed with D.

SW Teel came to Mother's house after she left the police station and explained the EPO. Teel advised Mother to get another protective order after the EPO expired, and she acted neutrally, neither confirming nor denying she would do that. She subsequently went to the hospital, where the nurse told her the tests on C.A. showed no pain or difficulty and there was no sign of strangulation. Sergeant Lloyd and SW Teel told her C.A. indicated being choked but when Mother left the hospital, there was no indication of strangling. After the medical evaluation, Mother concluded Boyfriend did not do anything resembling strangling to C.A. and her injuries were from the car seat straps. Mother also believed C.A. was led by law enforcement and CPS, particularly in the forensic interview.

Mother reiterated she cooperated with police and CPS, and she was not offered services other than a protective order. However, she began therapy in February, which she communicated to two SWs other than Teel.

Mother was pregnant at the time of the jurisdictional hearing. She testified the criminal charges against Boyfriend were dismissed, and they were living together but were not engaged. Mother said she would return to residing with Boyfriend if allowed by the court, which we interpret to mean she would return to living with both C.A. and Boyfriend if the court allowed it.

### 5. Summary of Boyfriend's Testimony

Boyfriend testified that when he picked C.A. up from school the day she was injured, he was frustrated and upset with her for lying. When they got home, he described, and demonstrated on a physical car seat in the courtroom, how he released the

19.

lap buckle and chest clip of the car seat but forgot to loosen the shoulder straps. He stepped back because C.A. liked to get out of her car seat by herself and his eyes were elsewhere. When he looked back, the plastic clip was under C.A.'s chin, the strap was across the bottom of her face, and her body was slightly out of the car seat. He removed the strap from her face, picked her up, and removed her from his truck. They talked about lying and bullying once inside, he raised his voice, and he then sent her to her room, where she had to stand against the wall.

When Mother got home, Boyfriend saw a mark in the area of C.A.'s chin and jawbone, which he thought looked like an abrasion from being rubbed, and he saw a scratch on her arm.[11] He applied lotion along her jawbone and touched the area to see if it was painful. She said it did not hurt. Mother and Boyfriend then took C.A. to her gymnastics class that evening, where she had a really good time.

Boyfriend denied he was household disciplinarian and testified they worked as a team. He denied ever hitting C.A. or placing his hands on her throat in a harmful manner, and said they did not spank in their household and C.A. was not afraid of him. After the police called Mother, Boyfriend went to the police station with her. He testified he was honest and cooperative with officers, and he never declined to speak with law enforcement or CPS. He explained that he had been diagnosed with anxiety at least 10 years earlier and was on medication for anxiety and for ADHD. He acknowledged pacing and sweating during his police interview, and he testified that his anxiety spiked when he was handcuffed, and he was having a full-blow panic attack by the end of the interview.

After he was arrested, he was given a copy of the EPO and from that time until the EPO's expiration on January 19, he did not go back to the house or contact Mother. His

---

[11] On cross-examination, Boyfriend said he saw a red mark or scratch near C.A.'s chin when he got her out of the truck, but he did not inspect her for injuries.

20.

parents bailed him out of jail, and he stayed with a friend of Mother's, who picked him up after he was released and told him about C.A.'s hospital visit. He spoke to SW Teel on January 17 and she told him he needed to stay away from the house because returning could jeopardize C.A.'s safety. He told SW Teel he thought everything was being blown out of proportion and that he had been told C.A. was evaluated at the hospital and there were no signs she had been strangled. He said he initially did not understand why he had to remain out of the house and his attorney told him he could return once the EPO expired, but once Teel told him his return could jeopardize Mother's custody of C.A., he understood and told Teel he would stay away from the house. He also told Teel again at the end of their conversation that he would not return if it put Mother's custody of C.A. in jeopardy. He did end up returning to the house after the EPO expired and explained that he understood C.A. had been removed several hours earlier.

## B. Juvenile Court's Ruling

During argument following the conclusion of the evidence, the Department retreated from its theory that the injuries were inflicted by Boyfriend when he choked C.A. Counsel argued that the evidence did not show Boyfriend tried to strangle C.A. and her injuries instead occurred when he yanked her from her car seat and then put his hands on her face in the bedroom. Counsel requested that the juvenile court amend the petition to conform to the evidence so that the petition reflecting that Boyfriend was angry; he aggressively removed C.A. from her car seat, causing injury; and he then grabbed her by the face and neck, causing bruising. (*In re G.B.* (2018) 28 Cal.App.5th 475, 485-486 ["[T]he court may amend the petition 'to correct or make more specific' the factual allegations that support the basis for establishing jurisdiction 'when the very nature of the charge remains unchanged.' "].)

The juvenile court declined to amend the petition and after reviewing the evidence in detail, the court concluded the Department met its burden on the allegations set forth in the petition. The court stated, "I do believe, perhaps, that C.A. got tangled in her straps,

but I do not think that this was – and I do believe she got injuries from being tangled, but I do not think – I think the majority of injuries happened from [Boyfriend] wrapping his hands around her neck. [¶] I think he used this car seat incident as a way to be dishonest about what happened while they were in the house." The court sustained the petition allegation, found C.A. as described by section 300, subdivision (b)(1)(A), and set a disposition hearing.

## III.    Disposition Hearing

The disposition hearing was held on September 30. The court heard testimony and in addition to the dispositional report of July 18, the Department submitted a supplemental report on September 26.

### A.    Father's Testimony

Father testified about their general schedule and activities in his home, and said C.A. fit in with his family and seemed happy on a daily basis but was sad at times after ending her calls with Mother. She only had a few behavioral incidents at school during the second half of her kindergarten year, following her placement in Texas. However, C.A. had behavioral issues at camp over the summer and was having issues in school, including pushing or hitting other children, hitting her teacher, being disruptive, hiding under the table, and spitting her water out on one occasion, but she was not sent home or suspended. The last two weeks of summer camp, C.A. mostly had bad days, but Father was told by a counselor that it takes six to nine months for a child to feel comfortable and safe, and that can lead to boundary pushing, to which he attributed the behavioral issues.

For discipline, Father spoke to C.A. about her inappropriate behavior and, if punishment was necessary, sent her to her room for 30 minutes or so. For repeated behavioral issues, he took away some privileges, her tablet, and certain toys. Father and C.A.'s stepmother met with the principal, vice-principal, and teacher to formulate a plan, and they followed the recommendations given and tried their own methods, but at times, C.A. remained noncompliant. Father set up counseling for her, which she was due to

22.

start in the near future, and he asked the school to conduct an assessment to see if she had any specific needs that could be addressed. Father disclosed that he was diagnosed with ADHD as an adult, but his mother and siblings were diagnosed as children. Some of his family members took medication, and Mother had requested the school assess C.A. for ADHD.

On bad days at camp, C.A. expressed missing Mother and wanting to return to her but calls with Mother could be disruptive to C.A.'s schedule and he thought she would get used to having fewer calls with Mother.[12] Father testified that C.A. on occasion, perhaps five or eight times, mentioned Boyfriend, both to him and when talking to Mother. Once when she was brushing her teeth, she said Boyfriend caused or "did" the boo-boos on her arm and face. Father said he informed the social worker in or around May.

Prior to picking C.A. up in early 2024, Father last saw her in December 2021. He explained that in 2022, he planned to drive to Georgia, where she was living, to visit, but in October, Mother informed him she was moving to California and he was not in a financial position to fly to California to visit at Christmas as planned. Prior to that, COVID-related travel restrictions interfered with his ability to visit. However, he said the onus was always on him to visit, and Mother did not travel with C.A. to visit him. He also testified he tried to do six to eight calls monthly, and no fewer than two a week, but sometimes Mother would tell him they were not available for a call. He also described the frequency of the calls as "slowly diminishing" and said he was told C.A. was busy, had a headache, or other things.

### B.     Mother's Testimony

Mother testified that in mid-July, she signed up for a combined parenting and child neglect class, and a class on failure to protect/learning to protect; and that she informed

---

[12] Mother engaged in comfort calls and video visits with C.A.

social workers of this. She and Boyfriend also both started therapy together in late February with a marriage and family therapist, but she later understood that would not affect the Department's recommendations because she needed to start therapy with a county-approved provider. Mother asked two social workers about classes for Boyfriend but was told because he was not a parent, he was not a part of the case plan. Boyfriend was taking a combined parenting neglect and anger management class, however, and Mother introduced evidence he enrolled in the class on August 10.

Mother acknowledged she was offered the classes as part of the initial case plan but was told they were voluntary, and she delayed taking them due to her distrust of social workers, particularly SW Teel, because Mother felt lied to, she was not provided with services to prevent C.A.'s removal, and Teel told her they would work on a safety plan and instead removed C.A. without following up. She also testified she understood the Department did not want Boyfriend in the house and that was to be part of the safety plan that was mentioned to her, but she and Boyfriend agreed to that prior to C.A.'s removal. Mother began her case plan components in July, after she and Boyfriend met with SW Yeager. She felt SW Yeager got to know her and Boyfriend, who were living together and expecting a child.[13]

Mother testified C.A. was participating in gymnastics, basketball, and soccer prior to removal. She did not know how many calls with Father were missed but she described his attempts as "few and far between" and disagreed with his estimate that he tried to call six to eight times a month. She testified he called once a week and never on the weekend, when they had more time. She described his relationship with C.A. as good

---

[13] SW Yeager met with Mother and Boyfriend approximately one week before the jurisdictional hearing, but that information was not included in the reports the juvenile court had for the hearing. The information was later included in the supplemental disposition report and SW Neubauer testified concerning the lag between contacts and the entry of those contacts in the system.

24.

and friendly, and said his call schedule had been consistent before starting to dwindle. She agreed that based on C.A.'s schedule, daily phone calls from Father could not have been accommodated, but she communicated their schedule and left it open for Father to set up a more structured schedule. She testified she talked to C.A.'s PCP about assessing her issues, but he wanted to wait until she was a little bit older to see if the behaviors continued.

C.A.'s behavioral issues in kindergarten prior to her removal included talking back, being mean to her friends, and hitting other children. Mother said she and Boyfriend had made progress resolving these issues prior to C.A.'s removal through a discipline system that focused more on rewarding good behavior, and the owner of her school told Mother C.A.'s behavior was improving over a period of nine months, although she was still sitting on the thinking stool on a daily basis. After C.A.'s removal, Mother initially addressed her behavior with her and lectured her to some extent. She subsequently changed the nature of her calls so they were more fun and relaxed after her therapist told her Father should be handling discipline since he was the custodial parent. Mother would tell C.A. to listen to Father when C.A. was acting out toward him. She felt C.A. relied on her for emotional support, and C.A. would tell Mother she missed her and that she cried because of it. Mother testified C.A. had also expressed missing Boyfriend and said she loves him like she loves Father.

Mother testified, consistent with her jurisdictional hearing testimony, that Boyfriend was not abusive toward her, she was not aware of him being abusive toward any child, and he had no criminal record. She maintained Boyfriend did not physically assault C.A., but she understood the juvenile court found he did. She testified that if "everything pointed" to Boyfriend abusing C.A., he would no longer see either of them. Asked what she was doing to address the possibility the court was correct, Mother said she was completing the recommendations and also attending therapy. She had only two

25.

parenting neglect classes left, and 16 classes left in the longer class about failure to protect/learning to protect.

### C.    SW Neubauer's Testimony

SW Neubauer testified that nonparents have been added to case plans where the person resided with child and was a parental figure for a significant amount of time. Based on the length of time Boyfriend lived with Mother and C.A., and given that C.A. knew Father and he was present in her life, the Department did not consider Boyfriend to be an alleged father.

SW Neubauer testified concerning contacts with Mother that occurred before the jurisdictional hearing but were not included in a report until the supplemental dispositional report of September 26.  She explained that in preparing a report, social workers usually look back two weeks because social workers typically have around 14 days to enter contacts, although some social workers take up to 30 days depending on their caseload.  In this case, Neubauer went back further than two weeks and included those contacts in the report submitted prior to the jurisdiction hearing, but some contacts were entered after that report was submitted.

### 4.    Juvenile Court's Ruling

After argument, the juvenile court adjudged C.A. a dependent of the court under section 300, subdivision (b), and found by clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of C.A. if she was returned to Mother's home, and there were no reasonable means by which her physical health could be protected without removing her from Mother's physical custody.  (§ 361, subd. (c)(1).)  The court granted Father's request for placement and awarded him sole physical custody, awarded Mother and Father joint legal custody and twice weekly two-hour visits for Mother, and terminated the dependency jurisdiction.

**DISCUSSION**

## I.  Legal Principles

"The Department has the burden of proving by a preponderance of the evidence that [C.A. was a dependent] of the court under section 300."  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  " 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' "  (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).)

" 'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.' "  (*In re G.Z.* (2022) 85 Cal.App.5th 857, 876 (*G.Z.*).)  "Substantial evidence is not synonymous with *any* evidence; a decision supported by a ' "mere scintilla of evidence" ' need not be affirmed on appeal.  [Citation.]  Further, ' " '[w]hile substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence." ' " ' "  (*Ibid.*)  " ' " ' "[I]nferences that are the result of mere speculation or conjecture cannot support a finding [citations]."  [Citation.]  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." ' " ' "  (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 (*J.A.*), italics omitted; accord, *In re B.D.* (2024) 103 Cal.App.5th 315, 323-324 (*B.D.*).)

"As relevant here, under section 300, subdivision (b), a child may be subject to dependency jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of a parent's failure or inability to adequately supervise the child[.]"  (*B.D., supra*, 103 Cal.App.5th at p. 324, citing § 300, subd. (b)(1)(A).)  "[A] parent's conduct—short of actually creating the danger a child

27.

faces—may still satisfy the standard required under the first clause of section 300[, subdivision] (b)(1)." (*R.T., supra*, 3 Cal.5th at p. 633.)

" 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.' " (*In re E.G.* (2025) 112 Cal.App.5th 707, 721.)

## II.    Analysis

Under section 300, "A child … is within the jurisdiction of the juvenile court[,] which may adjudge that person to be a dependent child of the court" (*ibid.*), if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of … [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child" (*id.*, subd. (b)(1)(A)).  "A jurisdictional finding under section 300, subdivision (b)(1), requires [the Department] to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.  [Citation.]  While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the child to the defined risk of harm.  Previous acts of neglect alone do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur." (*G.Z., supra*, 85 Cal.App.5th at p. 877.)

### A.    Mother's Failure to Protect C.A.

As an initial matter, the record is devoid of evidence that Mother could have or should have known C.A. was at risk of harm by Boyfriend.  Mother and Boyfriend had known each other for years, but reconnected in March 2023, when C.A. was almost five years old.  Both were employed with no criminal history, no CPS history, no issues with drugs or alcohol, and no history of domestic violence; and the home they shared with C.A. presented no safety or other concerns.  Prior to January 12, there was no record of any concern that C.A. was abused or neglected.

Before the dependency petition was filed, Officer Bebee communicated to SW Teel that Mother disclosed prior physical abuse, and that allegation was set forth in the dependency petition. However, our review of the record revealed no indication of prior abuse. The allegation in question was based on Mother's statement to Bebee that Boyfriend had grabbed C.A.'s chin in the past. Absent additional facts in evidence here, grabbing a child's chin and turning her head so that she is looking at the parent or caretaker, which Mother testified she communicated to Bebee and she speculated might have occurred, does not constitute physical abuse under the law.

" ' "[A] parent has a right to reasonably discipline his or her child and may administer reasonable punishment[.]" ' " (*D.M., supra,* 242 Cal.App.4th at pp. 640-641.) "Whether a parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of this parental right to discipline turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.' " (*Id.* at p. 641.) Both C.A. and Mother described and demonstrated that Mother and Boyfriend would grab C.A.'s chin and turn her head toward Mother or Boyfriend when she was not listening. There is no evidence this caused C.A. pain, left marks on her, or otherwise physically harmed her; and there is no evidence that grabbing C.A.'s chin entailed something other than what C.A. and Mother described.

Given the absence of any evidence of prior abuse or neglect, and the absence of any evidence that Boyfriend presented any known or inferable risk to C.A. at the time of the injury, it necessarily follows that there is not substantial evidence Mother failed to protect C.A. from harm at the hands of Boyfriend on January 11. This does not end the matter, but before addressing whether there is a substantial risk of future harm to C.A. based on Mother's failure or inability to protect her, we address the injuries.

29.

## B.   Infliction of Serious Physical Harm

Mother argues on review that there is insufficient evidence C.A. suffered "serious physical injury." (§ 300, subd. (b)(1)(A).)  With respect to this issue, "the statute does not define what constitutes such harm, [but] it has withstood a void-for-vagueness challenge because the term has a sufficiently well-established meaning and is no less specific than the phrase 'great bodily injury.' [Citation.]  'Although there may be an "I know it when I see it" component to this factual determination [of what constitutes "serious physical harm"], as with the term "great bodily injury" we believe that parents of common intelligence can discern what injuries fall within its reach.' " (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138-139 (*Isabella F.*), quoting *In re Mariah T.* (2008) 159 Cal.App.4th 428, 436–437 & 438 (*Mariah T.*).)

Whether an injury rises to the level of a serious physical injury is a factual determination for the juvenile court, but its finding must be supported by substantial evidence.  In *Mariah T.*, the appellate court found that striking a three-year old with a belt on the stomach and forearms, leaving deep, purple bruises on at least one occasion, was sufficient to establish serious physical harm under subdivision (a) of section 300. (*Mariah T., supra*, 159 Cal.App.4th at p. 438.)  In contrast, in *Isabella F.*, the appellate court concluded the minor did not suffer serious physical injury during an isolated altercation with her mother where she suffered scratches on one side of her face consistent with fingernails and a gouge mark on one earlobe. (*Isabella F., supra*, 226 Cal.App.4th at pp. 131-132 & 138-139.)

This case does not involve a claim of alleged physical discipline, but C.A. suffered bruising, which the juvenile court found was the result of Boyfriend wrapping his hands around her neck and from being tangled in the car seat straps when he pulled her out of her car seat.  The court did not find Mother or Boyfriend credible and on review, we accept the court's credibility determinations and do not reweigh evidence, so long as there is sufficient evidence in the record to support the ruling.  As previously stated, a

30.

mere scintilla of evidence will not suffice, and we must consider the ruling in light of the whole record. (*G.Z., supra*, 85 Cal.App.5th at p. 876; *J.A., supra*, 47 Cal.App.5th at p. 1046.) Further, disbelieving a witness, without more, does not support a reasonable inference that the witness did what he denies. (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1266 (*Boatman*), citing *People v. Velazquez* (2011) 201 Cal.App.4th 219, 231, disapproved on another ground by *People v. Reynoza* (2024) 15 Cal.5th 982, 1013, fn. 22; accord, *Ayon v. Esquire Deposition Solutions, LLC* (2018) 27 Cal.App.5th 487, 498 [" 'The rejection of a witness's testimony by the trier of fact has only the effect of removing that testimony from the evidentiary mix. Without more, the disregard or disbelief of the testimony of a witness is not affirmative evidence of a contrary conclusion.' "].)

C.A. never told anyone that Boyfriend choked her or hurt her, and Officer Bebee and the PA did not see fingermarks, notwithstanding the initial contrary police report. The evidence of choking is based on a gesture C.A. made during her forensic interview. Although her gesture was not recorded on video or seen by SW Teel or Officer Bebee, who were not in the interview room, Maxwell testified about the gesture.

The medical evidence was equivocal concerning the explanation for C.A.'s injuries. When C.A. was examined on January 12, she told the nurse when asked that no one hurt her, her medical evaluation by both the PA and the nurse reflected she was not in any pain, she exhibited no signs of injury beyond the bruises, and further testing was not medically indicated. The PA, whom the juvenile court credited, testified that bruising of the neck and chin in children is not often seen and is alarming, particularly neck bruising, an opinion with which we do not disagree. As a mandated reporter, the PA would have reported the bruising based on its location but did not since CPS was already involved. She testified it was possible to get bruises like C.A. had from being suspended by seatbelt or car seat straps, and the jaw bruising "fit" with a man grabbing her chin to turn her head. Choking was also a possibility that could not be fully ruled out. The nurse and

31.

PCP also found C.A.'s injuries consistent with the car seat straps explanation. None of the medical providers opined that C.A.'s injuries were due to choking or even that they were more likely due to choking. (See *G.Z., supra*, 85 Cal.App.5th at pp. 877-878.)[14] Thus, medical evidence was inconclusive concerning the cause of C.A.'s bruises. (*Id.* at p. 878.)

We note that the juvenile court found Mother manipulated the information given to the medical professionals, but we do not find any support in the record for a conclusion that Mother misled the medical providers or otherwise caused them to misunderstand the possible source of the injuries. All three providers knew both that CPS was involved and that the injuries were possibly sustained from being tangled in car seat straps or from being choked; and the PA and the nurse were aware of the allegation that C.A.'s face was grabbed. For the purpose of medically evaluating C.A.'s injuries, those were the relevant allegations.

Moreover, C.A. was only five so there was nothing unusual or unreasonable about the accompanying adult needing to be the primary communicator such that this fact could support a reasonable inference that Mother prevented C.A. from talking or otherwise

---

[14] In *G.Z.*, which involved a jurisdictional finding under section 300, subdivision (a), the appellate court concluded there was no substantial evidence in the record that the child's subdural hematomas were caused by abuse or neglect. (*G.Z., supra*, 85 Cal.App.5th at p. 878.) The agency's expert witness concluded that the injuries may or may not have been caused by trauma and trauma could not conclusively be ruled out. (*Ibid.*) The court explained, "It is not Mother's burden … to exclude nonaccidental inflicted trauma as a possible cause of G.Z.'s injuries. It is [the agency's] burden to prove by a preponderance of the evidence that nonaccidental trauma was the cause of injury. Because [the doctor] could not categorically establish the cause of the older/chronic subdural hematoma, she stated she could not rule out nonaccidental trauma. Lack of conclusive evidence does not equate to evidence of neglect proven by a preponderance." (*Ibid.*) We recognize that *G.Z.* evaluated the evidence of nonaccidental trauma under subdivision (a), but we find the reasoning of assistance where, as here, we have a court finding that Boyfriend choked C.A., which is a very serious allegation, the documentation of visible finger marks in the police report proved unsupported by evidence, and the medical evidence was inconclusive.

interfered. The record simply does not support an interpretation of manipulation. C.A. was initially shy with both providers at the hospital, and we note that she was unable to testify in this matter, even with Father sitting with her and the camera on Mother's face. She was young and was simply too nervous or upset to respond to questions.

Nevertheless, the juvenile court found C.A. and Maxwell, the forensic investigator, both credible and found that C.A. "did have a voice" because she was willing to correct the interviewer. The issue of whether C.A. was choked is close given the medical evidence and the limitation of the disclosure to the unrecorded gesture in the forensic interview, but Maxwell testified that C.A. gestured Boyfriend put his hands on her throat in that interview and the court also gave weight to Boyfriend's denial of choking or putting his hands around C.A.'s throat, which occurred prior to Officer Bebee telling him about C.A.'s gesture.

Further, C.A. consistently and repeatedly attributed her injuries to being pulled out of her car seat. Although Boyfriend stated that C.A. became hung up when she was getting out of the car, C.A. never indicated she slipped, tripped, or otherwise entangled herself in the straps. To the contrary, she was clear and consistent in stating that it happened when Boyfriend pulled her out of her car seat, and given the extent of the bruises, he necessarily did it forcibly. Although there is no evidence the incident resulted in injury to Camile other than bruising and she did not report any pain, the bruising is nevertheless significant.

The determination whether an injury rises to the level of a serious physical injury is inherently factual and within the discretion of the juvenile court so long as it is supported by substantial evidence. In this instance, in addition to the evidence already discussed, the court had photographs of C.A.'s injuries that were taken when the injuries were fresh, and the PA described the bruising as alarming. Therefore, we conclude there is credible evidence from which the court could conclude that C.A. was injured when

33.

Boyfriend put his hands on her throat and pulled her out of the car seat, and that the resulting injuries were serious.

### C. Substantial Risk of Serious Physical Harm

A "jurisdictional finding may not be based on a single episode of endangering conduct in the absence of evidence that such conduct is likely to reoccur." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 (*Yolanda L.*); accord, *G.Z., supra*, 85 Cal.App.5th at p. 877; *In re J.N.* (2010) 181 Cal.App.4th 1010, 1023.) "[E]vidence of past events may have some probative value in considering current conditions. But under section 300, subdivision (b) this is only true if circumstances existing *at the time of the hearing* make it likely the children will suffer the same type of 'serious physical harm or illness' in the future. This is so because under subdivision (b) a child may be considered dependent 'only so long as necessary' to protect the child from risk of suffering serious physical harm or illness. For this reason, 'the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm, "[t]here must be some reason to believe the acts may continue in the future." ' " (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388, fns. omitted; accord, *G.Z., supra*, 85 Cal.App.5th at p. 877.)

The Department acknowledges that at the time of the jurisdiction hearing, a substantial risk of serious physical harm in the future must be shown. Its argument on this point is as follows: "Although mother stated she would keep [Boyfriend] out of the home, her conduct revealed otherwise. [Boyfriend's] criminal charges had been dismissed and there would be no oversight through the criminal court. The juvenile court could readily infer from [her] refusal to acknowledge the abuse of her child, her hostility toward law enforcement and DHS, and her professed complete trust in [Boyfriend] combined with her failure to engage in protective educational courses that C.A. was at risk without court intervention." The Department also cites *A.F.* for the proposition that " 'denial is a factor often relevant to determining whether persons are likely to modify

34.

their behavior in the future without court supervision.' " (*In re A.F.* (2016) 3 Cal.App.5th 283, 293 (*A.F.*).)

However, as stated, "previous acts of neglect alone do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur." (*G.Z., supra*, 85 Cal.App.5th at p. 877, citing *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565; accord, *In re L.B.* (2023) 88 Cal.App.5th 402, 416; *In re J.N.* (2021) 62 Cal.App.5th 767, 775.) *A.F.,* cited by the Department for the proposition that denial is a relevant factor, involved a mother who was combining alcohol, methadone, and psychiatric medication, in contravention of her doctor's orders, and she continued to deny this was affecting her judgment or posed a risk to her child. (*A.F., supra*, 3 Cal.App.5th at pp. 288-289 & 292-293.) Thus, the case involved a pattern of behavior by the mother, not an isolated incident of harm committed by a caretaker where there is no evidence the parent had any reason to know there was any risk of harm and no evidence of a pattern or incident of prior harm. Similarly, in *Gabriel K.*, in the context of affirming the juvenile court's denial of reunification, the appellate court stated, "One cannot correct a problem one fails to acknowledge" (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197), but the record in that case reflected the mother "had an unwavering pattern of drug use, child neglect and criminal conduct, despite the services she had received through the child welfare and probation systems" (*id.* at p. 193). Other cases similarly involve a pattern or past history of problems. (See *In re B.L.* (2025) 111 Cal.App.5th 151, 154 & 160-161 [where the mother drove drunk at high speed and crashed car, resulting in brain bleed in baby; attempted to put baby back in car seat; and interfered with witness's attempts to assist and call 911, there was sufficient evidence of future risk despite laudable progress, given severity of incident and mother's secrecy]; *In re M.D.* (2023) 93 Cal.App.5th 836, 857-858 [future risk not speculative where the father repeatedly left eight-year-old child alone and, even when present, provided "egregiously deficient" care; continued to deny allegations; and demonstrated lack of insight]; *In re*

*Marriage of Emilie D.L.M. & Carlos C.* (2021) 64 Cal.App.5th 876, 882 [in family law case involving international custody dispute, the father's failure to acknowledge excessive drinking, acts of domestic violence, and repeated instances of driving while intoxicated belied his claim ameliorative measures existed to protect his children]; *In re V.L.* (2020) 54 Cal.App.5th 147, 156 [recurring domestic violence between parents, which was denied by the father]; *In re D.B.* (2020) 48 Cal.App.5th 613, 621-622 [risk of serious emotional damage where the father was violent and denied it; verbally abused 12-year-old child; engaged in racism toward the mother and her family, and by extension the child; engaged anger-driven irrationality and impulsivity in court; and lacked insight]; *In re M.R.* (2017) 8 Cal.App.5th 101, 109-110 [parents minimized conduct and denied the mother was drunk where she drove 80 miles per hour with the children not properly restrained while significantly intoxicated]; *Yolanda L., supra,* 7 Cal.App.5th at p. 996 [lack of insight into risk posed by loaded gun supported potential future risk where court found evidence that father was likely to continue engaging in drug trafficking]; *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113 [evidence supported jurisdiction where there was ample evidence father was molesting the children and mother knew about it but failed to protect them].)

We understand the Department's and the juvenile court's concern that Mother would fail to protect C.A. from future harm given that she and Boyfriend were living together, they were expecting a child, and Mother believed Boyfriend did not choke C.A. However, as stated, there is no evidence of prior child or domestic abuse, drug or alcohol abuse, untreated mental illness, conditions of general neglect, involvement in criminal activity, or other history that might support a non-speculative risk of future harm. This case involves a single incident without any past history of problems and although Mother did not believe Boyfriend intentionally harmed C.A., she had not seen marks like that before on C.A. and she did not dismiss them. She also complied with the EPO, and prior

36.

to Boyfriend moving in with Mother in July 2023, she supported and parented C.A. as a single parent, providing her with a stable home without incident.

The Department bears the burden of demonstrating a risk of serious physical harm that is substantial, and mistrust of Mother based on her intact relationship with Boyfriend, without more, is an insufficient basis to exercise dependency jurisdiction where there is no past history of abuse or neglect, and no past history of other circumstances that evidence an inability or unwillingness to protect C.A. from harm. Similarly, Mother's hostility toward law enforcement and the Department, mentioned by the Department, is not grounds for exercising jurisdiction over C.A. (See *In re Emily L.* (2021) 73 Cal.App.5th 1, 16, quoting *In re Ma. V.* (2021) 64 Cal.App.5th 11, 25.) ["[I]t is to be expected that parents may not be happy to have governmental interference in their private lives. The inability of a parent to get along with a social worker is not evidence to support a removal order. 'While a social worker or juvenile court may feel more comfortable and confident about a parent who is friendly and gets along with them, that is not what the law requires.' "].)

Under the circumstances here, there is insufficient evidence to establish jurisdiction over C.A. on the ground that there is a substantial risk of serious physical harm as a result of Mother's failure or inability to adequately supervise or protect her. (§ 300, subd. (b)(1)(A); *G.Z., supra*, 85 Cal.App.5th at p. 877.) This requires reversal of the juvenile court's jurisdictional finding and remand of the matter with instructions to dismiss the dependency petition. We observe that at the outset of this proceeding, Mother and Father had a parenting plan in place with joint legal custody. It has been almost two years since C.A. was removed from Mother's home and placed with Father in Texas, and more than one year since the disposition hearing. She is now in second grade and has been living with Father, her stepmother, and her younger half-sister since early 2024. The record reflects Father is providing a stable, loving home for C.A., and what she wants and what is in her best interest may have changed during the pendency of this

action.  While we are unable to affirm the juvenile court's jurisdictional finding, nothing precludes either parent from revisiting the issue of custody in family court.

## DISPOSITION

The jurisdictional finding is reversed, the dispositional orders are vacated, and this matter is remanded with instructions to dismiss the dependency petition.


FAIN, J.*

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.